So our first argument on the calendar today is United States v. McLeod. So, Ms. Baumgartel, you have ten minutes, but you reserved two for rebuttal, so that gives you eight minutes out of the gate. Let me just... May I ask you beforehand, is McLeod the correct way to pronounce it? Yes. All right. Ms. Baumgartel, you may proceed. Thank you, Your Honor. Sarah Baumgartel of the Federal Defenders, on behalf of Lanier McLeod, may it please the Court. This Court should reverse the revocation judgment against Ms. McLeod because the District Court lost jurisdiction to revoke her supervised release because of the unnecessary... When? When was it lost? After the Court delayed unreasonably and unnecessarily in revoking it. Okay, but that was something that Mr. Schneider didn't identify even in September. He didn't say that you've lost jurisdiction to Judge Donnelly, right? At that case, the... No, that's correct. The defendants did not object before the District Court. So when... I mean, it seems to me that the January 15th letter submitted by Mr. Schneider is sort of contingent in a couple of respects. It's one, it talks about an agreement in principle between the parties. And two, it talks about the need to confirm a guilty plea in state court with respect to the two counts that would be... Otherwise, the two specifications that would be admitted under the agreement in principle. With respect to the latter of those two, when was... I didn't see anything in the record as to when that confirmation was received by Mr. Schneider. Your Honor, on A40 of the record is Mr. Schneider's letter, and it unequivocally asks the Court to schedule a court appearance. No, no, just answer my question, though. I know that. My question is, is there anything in the record as to when the confirmation was received about the state court plea? Your Honor, the Court wasn't waiting on confirmation to schedule a plea. Okay, but just humor me and answer my question. Is there anything in the record about when that happened? No, Your Honor, which is how you know that the Court wasn't waiting on it. The record makes clear that at the time that the parties unequivocally asked the Court to schedule a court appearance for a plea, they were ready to proceed. Ms. McLeod pled guilty to those state court violations in 2018. That's a matter of public record, those convictions... Right, but it wasn't a matter of public record in the district court, right? It's a matter of public record. In 2018, she pled guilty to those offenses. Okay, and so what does the record show as to when the district court, either Judge Moskov or Judge Donnelly, learned about the state court guilty plea? It seemed to me it wasn't until September 27th when Judge Donnelly asks and is then told by Mr. Schneider. No, Your Honor, the guilty plea was in 2018, and in the letter sent in January, Mr. Schneider states that Ms. McLeod has already pled guilty. She has already pled guilty at that point, and in fact, he states... The state court proceedings would remain pending for a few more months. That's for her sentencing, Your Honor, yes. Her sentencing, she pled guilty in 2018, and then her sentencing was repeatedly delayed by the state. I think they were negotiating her sentence. And that was the basis, though, for their continued request for adjournments, right? Prior to January. Prior to January, so we're only contesting the last nine months of the delay here. So these violations first happened in 2017, and there were years of delays before 2021. We're not arguing about those. I think that when a state court proceeding is pending, some delay is reasonable and necessary to allow that proceeding to go forward. But by January... Judge Donnelly came on in, what, July? So that was two months. You wouldn't say that was unreasonable, would you? No, I would not say... Well, I would not always say two months would be unreasonable, but in this situation, what we see from the court proceeding is that there was no fact-finding, there was no legal research that needed to be done, there was nothing left to do. It was literally probably less than 30 minutes of court proceeding to enter the parties' agreed-upon disposition and sentence. And as a result of the delay prior to that, in simply scheduling a court appearance, Ms. McLeod effectively had an additional eight months of federal supervision. It nearly doubled the additional federal supervision that she was required to serve as a result of these violations. And what the letter makes clear and what the ultimate disposition makes clear is that there was nothing happening during that period of time. 3583I is designed to set some sort of limit on a court's power to adjudicate violations after the term expires. And that limit is necessarily flexible because there will be different requirements based on different cases, but the limit can't be meaningless. Are there any cases that you can point us to where jurisdiction was lost based on unreasonableness of delay? No. This court has never found the delay to be unreasonable. So what would be the standard that you'd be asking us to articulate? This court has looked at the legitimate interests of the party and the prejudice to the defendant. That's the test the court has applied in other cases. And in other cases, the court has applied it very flexibly. Whenever there's a situation where a legal motion is pending, where there's fact-finding that the federal court has to do, or even where, for example, a defendant is physically in state custody, meaning that there's no prejudice to them from the federal delay. None of those things were present in this case. And so we're asking the court to apply the test that it's already developed in these cases. If you look at the legitimate interests of the party and if you look at the prejudice to the defendant, both of those factors show that the delay here was unreasonable. So, I mean, I guess, would you suggest that Mr. Schneider was ineffective by not identifying, by not noting the prejudice and not moving for the dismissal for lack of jurisdiction? Your Honor, he's a member of my office, and so I hesitate to call him ineffective. But I do think that he should have raised that with the court, yes. The other issue is simply, as I've said, the prejudice to Ms. McCloud. She's now out of state custody, and if she had been able to start her new term of supervised release in this timely fashion, she would have had, as I said, roughly eight months fewer months of federal supervision. So for those reasons, we're asking the court to reverse the revocation judgment. Thank you. Actually, we've got a little time left, so might as well use it. You have a question? And so I noticed in the January 15th letter it talks about an agreement in principle. And so as contrasted to what? A final agreement? Your Honor, I don't know. I don't know what would be different from an agreement in principle. I suppose that plea agreements are always contingent, and so obviously a defense attorney doesn't literally have the power to bind their client to an agreement, and so even when we submit a signed plea agreement to the court, that is not a final plea. It's not a final agreement until the defendant personally appears in court and accepts it. No, I guess what it usually means, though, is that the terms have been fixed. So an agreement in principle suggests, at least to me, that there's at least some open-endedness, that it has not been formalized or finalized or fully approved, perhaps. Your Honor, the record we have is that the agreement that is set forth in that letter is what the parties agreed to and what happened when the final court appearance did take place. As I said, from a defense perspective, we personally can't bind our client. They have to actually appear in court and accept the agreement themselves. And so in that sense, every plea agreement is in principle until the defendant personally appears and goes through the colloquy with the court and accepts it. So I always would have thought it meant, sort of at least generally, in principle, was I've got to check with my client first, or in the case of the government, I've got to check with my superiors first. Anything in the record to indicate whether those things had happened? Your Honor, the indication we have is, as the letter says, the parties are ready to schedule a court appearance and ask the court to schedule a court appearance. I think the best evidence we have is that they have done everything on their end to show that they're ready, and they're asking the court to make time for them, and that's it. All right. One other question on that last point. This is in January 21, and I assume COVID protocols are still in place and there is some slowness. Do you have a sense of what that was like for, I guess, Judge Moscoff's process, if there was a delay? I don't, Your Honor. You know, part of, I think, what happened here is, of course, Judge Moscoff left the district court. She was elevated to a different position sometime between January and February in 2021. Somebody said not elevated. I apologize. And so that may be part of what happened here. I know that the Eastern District had resumed in-person proceedings in February 2021. Prior to that, they had remote protocols in place. I guess that would be a factor that we'd consider in reasonableness, though, that if proceedings scheduling was slowed due to the pandemic. Yes, although I will just note that this, of course, had been delayed since 2017. And so there were delays that were clearly attributable to both the pandemic and the state case starting in 2020. And this is additional delay on top of that. The actual sentencing in the state court didn't come until the following year, 2022, right? The sentencing in the state court was, I apologize, Your Honor, one second. I know she, I believe it was in, yes, January 2022. And then it was a custodial sentence that kept her in an additional nine months or so, right? Approximately, yes. All right. Well, thank you, Ms. Baumgartel. You've got two minutes for rebuttal. We'll now hear from your adversary, your friend, Mr. Reich. Am I saying that right?  It's Reich. Thank you, Your Honor. Okay, Mr. Reich. Good morning, and may it please the court. My name is Andrew Reich, and I represent the government in this case. The district court's judgment revoking Ms. McLeod's supervised release and imposing the additional term of supervision should be affirmed. The court had authority to revoke Ms. McLeod's release following its expiration because, one, a valid warrant or summons had been issued before the term. I don't think anyone's questioning that. Ms. Baumgartel, I don't think is questioning that. No, Your Honor. She acknowledges that the warrant was issued well before the termination of the term of supervised release. And she's not quibbling over three and a half years' worth of delay, she's saying, because clearly that's how long it took the state to get moving on the charges there. COVID, other things were at play. Hard to know exactly why it would take so long, but she's not quibbling with that. So she's really just talking about January to September. Exactly, Your Honor. And that period was reasonable, and it was reasonable under any formulation by the cases in this court and in this circuit and in other circuits. Importantly, Ms. McLeod was not prejudiced by any delay, and her liberty interests were not unduly infringed. Why is it eight months of supervised release not prejudice? I'm sorry, Your Honor, I couldn't hear your question. The subsequent term of supervised release was delayed by the eight, nine months. Yes, Your Honor. Why is that not prejudice? Your Honor, under the cases in this circuit, Ramos, Spencer, and other cases, the type of prejudice that the court is to examine is prejudice that the defendant might face in defending her violation of supervised release adjudication. Have witnesses' memories faded? Are witnesses unavailable? Has evidence become unavailable? Well, that's a type of prejudice. But, I mean, what about the prejudice of having to be under supervision? She was bailed, effectively, right? But that meant she was still being supervised by the probation department for the time that she was released from custody and the federal warrant vacated up until her sentencing. And then she got a new term of supervised release. So Ms. Baumgartel is saying that's nine extra months or maybe six extra months of supervision. Yes, Your Honor. Courts do look at prejudice and liberty interests somewhat separately. As far as liberty interests are concerned, it's worth noting that Ms. McCloud was not in custody during that time.  Now, during that time, she made no requests, at least on the docket, for any sort of modification of her bail terms, as is common practice and as is often permitted and accepted by courts in this circuit. There was no indication that she reached out and made any attempt for modification. In addition, the court actually did everything in its power to accommodate her liberty interests. At the time that her second warrant was issued for additional violations— Ms. Baumgartel is probably thinking, Sullivan wouldn't have been that nice. But COVID was going on. So, I mean, the district court vacated the warrant so that she could be released pending COVID, really. Precisely, Your Honor. And that's what happened. That's very considerate, one would say. But there's no explanation for what happens between January and September, right? We're kind of guessing. A little bit, Your Honor. But there is some information on the record. You know, certainly the case was transferred from one judge to another judge. And as soon as Judge Donnelly received the case, within a month, she scheduled a hearing on the calendar. And within a month after that, that hearing—or approximately a month later, that hearing did take place. As Your Honor has also noted, it was the pandemic. There were delays. And, indeed, courts in this circuit, in Ramos, this court, and other cases following Ramos, have indicated that the period of time may be perceived as reasonable, even if the court wasn't acting with dispatch. Or even if there was some oversight or complication due to COVID. It's not necessary that there be a specific reason that made it technically necessary to delay. It's only—the consideration, rather, is that there was some reasonable delay or that the period of time was not unreasonable, which is the formulation used in both Ramos and Spencer. Right. But so here, we've got a letter in January that says, we're ready. I mean, it does seem to suggest there's a couple of things that need to drop. But we're ready. And by the time you schedule a hearing, we'll have wrapped that up. It doesn't get into specifics, but does say that that's what they're asking for. And there's no response. There's nothing. And so I think what Ms. Baumgartel is saying is, you get a letter like that, the court better jump. Yes, Your Honor. It's worth noting that this was actually the second time that the parties came forward and that Ms. McLeod's attorneys represented that they had reached an agreement in principle, the first time being in February of 2018. And so I don't think it was unreasonable for— Did they ask for a conference in 2018? I'm not sure that they specifically asked for a conference at that time, but they informed the court that the parties had reached a plea agreement in principle. And so when they similarly informed the court in January of 2021 that the parties had reached an agreement in principle, it was not unreasonable to wait for confirmation given the wording of that letter, that they were awaiting confirmation that it should arrive shortly. And the representation in that letter that the state proceedings were still ongoing and would be for several months. We don't know if that's why Judge Moskoff was waiting the six months before it was reassigned. No, Your Honor. We're guessing that he was waiting for the state court sentencing to be done. So, Mr. Reich, were you counsel below? I was not, Your Honor. So is there anything in the record? I didn't see it. Ms. Baumgartel didn't seem to find it either. Are you aware as to when the state plea was confirmed, as alluded to in the January 15th letter? As Your Honor noted, I'm not aware of anything in the record that it was confirmed to the court until September of 2021. So it seems that what this really boils down to then is whether it's reasonable in the face of a letter like this in January for the court to wait or whether the court is obliged to take the bull by the horns and get this puppy moving. Recognizing that there have been three and a half years worth of adjournments or holding the case in abeyance pending resolution of the state proceeding. That's right, Your Honor. And the courts have in this circuit have observed, this court has observed, that that reasonableness really is an elastic concept. It's not made to be restrictive, but rather Congress's intent when it enacted Section 3583I was to affirm this court's ability to adjudicate VOSR proceedings after the term had expired. Yeah, no question about that. It's not nearly as strict as the speedy trial, right? But I guess elastic means it's not like that lady in The Incredibles who can go forever. So, like, where's the limit? Well, at the very least, Your Honor, courts in this circuit have interpreted Ramos's elastic language to mean that even if a court wasn't acting with dispatch, which is what Ramos, the formulation Ramos uses, or even if there was some amount of oversight, that does not rise to the level of making that time period unreasonable. If there's no other questions, anything else you wanted to cover, Mr. Wright? If there's no other questions, then the government will rest on its papers. All right. Thank you. Ms. Baumgartel, you have two minutes for rebuttal. Thank you, Your Honor. Just very briefly, the government mentioned a February 2018 letter. Following that letter, the court did schedule a conference, and you can see that from the docket, and that's at Appendix A-5. And so I think that at that time the court took that as an invitation to schedule a conference, which is what the party has explicitly requested here. Just briefly, litigants depend on courts to schedule things with dispatch, and I don't think you necessarily want to create a situation where we're pestering courts sending letters every month when you don't immediately schedule something. No. So certainly the defendant should have raised this at the time that she came in for her sentencing. But at the same time, I don't think it's unreasonable for a defendant to be a little hesitant to send letters asking, Hey, court. Look, I get what you're saying. I guess what makes this letter, if there had been a letter that says we're ready to go right away, period, that would seem to be different than we're ready to go, of course, defense counsel first needs to confirm that the specifications that she's agreed to plead to are ones that she's actually pled to in the state case because it would be pretty dire if they didn't match, right? I understand, Your Honor, and I don't want to beat a dead horse, but it is at 840 where they said the letter explicitly says the parties are ready to schedule an appearance. No, no question. It says what it says. The question is, is it unreasonable for the court to wait for the next shoe to drop or to get a confirmation? Or is it unreasonable and the court really is obliged to jump when you get a somewhat equivocal letter like this? I don't think we're going to find any precedent, not in this circuit, so it's kind of a judgment call. And unnecessarily, you're saying it's unreasonably, but this was unreasonable, is what I'm trying to say. The parties agree that it's certainly an elastic and flexible concept. The defendant's point is simply that it must have some meaning. And in order for it to have some meaning, this sort of delay must be found unreasonable. Okay. Well, thank you. We will reserve decision. And we'll try to decide the case within the next eight months. So thank you. Well argued and thoughtfully argued. We'll now hear the next case on the calendar, which is Monteguto v. United States. Thank you. Is it Monteguto? Monteguto. Monteguto. Yes. Okay. Thank you. Give me one second. Sure. No problem. Just writing the phonetic. All right. So, Mr. Isaac, you have ten minutes, but you've reserved three minutes for a rebuttal. I have, Your Honor. So that's fine. That gives you seven now. You may proceed. Sure. First, good morning. My name is Brian Isaac. I represent the plaintiff appellant. And you were the trial counsel? I was not. You were not. Just appellate counsel. And I've been doing personal injury cases for close to 40 years now. This is one of the most unusual cases I've seen, not only because of the facts, but because you have an individual working for 47 years at one company. I wish I could have people working in my firm for 47 years. We have people on this court who have worked that long for the company. Yeah, but a machinist is kind of unusual. So, let me tell you my position very, very simply. Our position is that under Tobin v. Stiesel, Court of Appeals decision of 64 New York 2nd 254259, an incident or an event which either activates a latent quiescent condition or exacerbates a preexisting condition is a cause as a matter of law. Okay. I mean, I don't think there's any real dispute on the law here. It seems to me that you're disagreeing with Judge Gujarati's finding of facts, her assessment and credibility of experts, really, right? Well, the answer is yes and no. Certainly, I know what the standard is. We have to show clear error in the fact. No, but it seems to me that Dr. Creighton gave testimony saying that the injuries to your client's knees and back and wrist were not caused or exacerbated by this accident. Isn't that what he said? That was his conclusion, but my position is that that conclusion doesn't follow from the facts. And let me tell you why as a matter of law. Listen, I could say I'm a judge on the Second Circuit Court of Appeals. It's not evidence because it's just not true. What happened here is this individual, according to my review of the record, if I'm wrong, my adversary will tell me, had no prior work problems. He said, I had no prior injuries to my knees. Did he have degenerative changes? Absolutely. Every single part of his body had degenerative changes. He had mastication. He had degeneration. He had disk space problems. He even had a torn ACL and torn menisci that everybody agreed was degenerative. But they were asymptomatic. And my argument is that there is a huge difference legally between a lesion, which does not cause injury, and an event or an accident which does. Example, if someone has a horrible back and the person is even a young person, but never misses a day of work, never goes for treatment, never has any symptoms, and then gets into an accident, if that accident causes that person to miss 90 in the 180 days following the accident, it is a legal cause as a matter of fact and as a matter of law. Now, I know what you're going to tell me. You're going to say, wait a second. How is that fair for someone in this situation who has this degree of degeneration to get a verdict? And my answer is simple. It's not an issue of liability. Serious injury under the 90-180 category and the 5102 and 5104 of the insurance law, even though it deals with damages, is a substantive element that the plaintiff has to prove.